Steven BRIECKE, Petitioner,

v.

**PEOPLE OF the STATE OF NEW YORK, Respondents.**

No. CV 94–2962.

United States District Court,
E.D. New York.

Aug. 13, 1996.

Steven Briecke, Ossining, NY, pro se.

James Catterson, Suffolk County District Attorney by Michael Blakey, Riverhead, NY, for respondents.

### MEMORANDUM & ORDER

WEXLER, District Judge.

Steven Briecke ("petitioner"), an inmate at the Sing Sing Correctional Facility, has brought the above-referenced action, pursuant to 28 U.S.C. § 2254, seeking a writ of habeas corpus. Petitioner was found guilty by jury verdicts on June 3, 1985 of burglary in the first degree, assault in the first degree, and grand larceny in the third degree, and was thereafter sentenced to concurrent terms of five to fifteen years and eight-and-a-third to twenty-five years for the burglary and assault, respectively, and a consecutive term of one-and-a-third to four years for grand larceny. His conviction was affirmed by Appellate Division, see People v. Briecke, 143 A.D.2d 1025, 533 N.Y.S.2d 584 (2d Dep't 1988), and leave to appeal to the New York Court of Appeals was denied. Petitioner's motion to vacate judgment was denied, as were his motions to reargue and appeal therefrom. This petition followed.

### I. BACKGROUND

The evidence at petitioner's trial established the following facts: At five o'clock p.m. on September 28, 1984, Ann Giangrande, a seventy-five year old women, observed petitioner pacing the street in front of her home in West Islip, New York. Trial Transcript ("Tr.") at 17. At ten o'clock that evening, Ms. Giangrande, who lived alone, heard petitioner at her door, demanding to be let in. Tr. at 15–16. Ms. Giangrande locked the door and attempted to telephone for help. Tr. at 16. To her surprise, the telephone was dead, even though it had been working an hour before. Tr. at 18. Detectives would later find telephone wires severed outside her home. Tr. at 131.

Ms. Giangrande then opened a bedroom window and called to a neighbor for help. Tr. at 19. She was met at the window, however, by petitioner who smashed her face with an object. Id. Blinded by her own blood, Ms. Giangrande struggled to retreat. Id. She made her way into another bedroom before being overtaken by petitioner, who had entered the dwelling through the window. Id. He placed a blanket over her head, explaining, "I don't want you to see my face." Tr. at 20. Ms. Giangrande testified that she recognized the voice as the same voice she had heard at the front door. Id.

Petitioner demanded, "I want your money [and] jewelry." Tr. at 21. He took $340 in cash, a watch, a bracelet, and several rings. Tr. at 24–26. He used water as a lubricant to remove the rings from Ms. Giangrande's fingers. Tr. at 25.

By this time, police had surrounded the house, and were knocking on the front door. Tr. at 66, 72. Hearing the knock at the front door, petitioner ran to the back door. Tr. at 73. But he found police there as well. Id. Desperate, petitioner decided to hide in a bedroom closet. Tr. at 76.

Police then entered the home, escorted Ms. Giangrande outside, and with guns drawn ordered petitioner out of the closet. Petitioner emerged shouting, "Kill me. Kill me. I don't care. Go ahead and kill me." Tr. at 78. An officer grabbed petitioner by his shirt and struck him with his gun. Id. Petitioner staggered slightly, but broke loose and ran toward the window. Id. Arms outstretched, petitioner dived headlong into the glass pane. Tr. at 79. Police were able to grab his legs and pull him back into the home. Id. After a short, but violent struggle, petitioner was handcuffed, placed under arrest, and taken by ambulance to Good Samaritan Hospital. According to the arresting officers, petitioner was rational once he stopped struggling and understood he was with police officers.

Detectives found the light bulbs unscrewed in front-porch lamps, which Ms. Giangrande believed to have been lit earlier in the evening. Tr. at 68, 132.

Petitioner, who resided one block from Ms. Giangrande's home, testified that he had been sent to the school psychiatrist as a child and eventually dropped out of school in tenth grade. Tr. at 158. He attributed his trouble in school to a discipline problem. He enlisted in the army at age seventeen, but was later discharged because he had made fraudulent statements on his application. Tr. at 166.

Petitioner testified that since the age of sixteen he had attempted suicide several times and that he had checked himself into the VA Hospital in Northport for a week. Tr. at 170–71. On cross-examination, he admitted that he had actually been taken there by police. Medical records from the Northport VA Hospital indicate a diagnosis of "anti-social personality disorder," and medical records from another admission to Kings Park Psychiatric Hospital indicate a diagnosis of "episodic explosive disorder." Tr. at 225–26, 253.

Petitioner testified that since his army discharge, he had been arrested for a number of misdemeanors, including unauthorized use of a motor vehicle, petit larceny, and reckless endangerment in the second degree. Tr. at 190, 197.

Petitioner denied that he was walking up and down in front of the victim's house at five o'clock, but supported this denial only with the fact that he owns a car. Tr. at 184. He also testified that he "knew the inside of [Ms. Giangrande's] house like the back of [his] hand." Tr. at 184.

Petitioner was hospitalized for a week following the incident and was later seen by prison psychiatrists, who prescribed lithium and thorazine. Tr. at 234.

In addition to petitioner's testimony, the defense relied on the testimony of Dr. Tsu Teng Loo, a psychiatrist for twenty years at Pilgrim State and Central Islip Psychiatric Centers. Dr. Loo is not board certified in forensic psychiatry and had testified in criminal cases as an expert only four times prior to the petitioner's case. Tr. at 217, 240–41. Dr. Loo diagnosed the petitioner as having bi-polar affect disorder, in the form of manic depression, and acute brain syndrome as the result of the ingestion of muscle relaxants and alcohol. Tr. at 223, 255. He also testified that the ingestion of drugs and alcohol could trigger mood swings in a manic depressive, and that "at the time of the alleged crime, [petitioner] was not mentally capable of understanding what he was doing and that what he was doing was wrong." Tr. at 238.

The prosecution's rebuttal witness was Dr. Harold Zolan, a psychiatrist for forty years who is board certified in forensic psychiatry. Trial Transcript, Volume II ("Tr. II") at 26. He had testified in criminal cases over 350 times for both the prosecution and defense. Dr. Zolan diagnosed petitioner as having an atypical character disorder and multiple substance abuse. Tr. II at 35. It was Dr. Zolan's opinion that petitioner had the complete ability to "know and appreciate the nature and consequences of his conduct and whether that conduct was wrong." Tr. II at 39. He further testified that petitioner neither suffered from bi-polar depression nor acute brain syndrome and that he doubted alcohol and muscle relaxants could ignite a psychotic state in a bi-polar depressive person. Tr. II at 43, 51. As to petitioner's prior hospitalizations, Dr. Zolan testified that these were for personality disorders not mental diseases. Tr. II at 44.

The trial judge charged the jury as to the elements required for burglary in the first degree, grand larceny in the third degree, assault in the first degree, and the lesser offense of assault in the second degree. Tr. II at 115–30. The judge also gave instructions on intoxication and insanity defenses. Tr. II at 130–46.

The jury returned guilty verdicts. At sentencing, the judge found that the grand larceny was a separate and distinct crime from the burglary, even though both crimes occurred simultaneously. Tr. II at 119.

After exhausting his remedies at the state level, petitioner filed the instant petition for collateral relief. He advances four grounds in support of his petition: (1) that he was denied a fair trial as a result of prosecutorial misconduct; (2) that he was denied effective assistance of counsel; (3) that his guilt was not proven beyond a reasonable doubt; and

(4) that his sentence was excessive and not authorized by statute.

## II. *DISCUSSION*

### A. *Prosecutorial Misconduct*

■ Petitioner argues that the prosecution's failure to disclose exculpatory evidence prior to trial violated his constitutional right to a fair trial. Indeed, the suppression by the prosecution of evidence favorable to an accused violates due process. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). However, "[w]here defendants have ready access to evidence that may be exculpatory, they cannot complain that it was withheld in violation of *Brady.*" *United States v. Jones,* 712 F.2d 115, 122 (5th Cir.1983).

■ In the instant case, the allegedly undisclosed evidence was the result of a blood-alcohol test administered to petitioner at Good Samaritan Hospital on the night of his arrest. This record was readily accessible to either party, and could easily have been obtained by defense counsel. In fact, the trial record reflects that *it was* obtained by defense counsel. Pursuant to a subpoena issued by the trial judge, defense counsel had obtained petitioner's past medical records from Northport VA Hospital, Kings Park Psychiatric Hospital, and the records of his admission to Good Samaritan Hospital on the night of the arrest. Tr. at 107–108, 152–154. It was from defense counsel that the prosecution acquired some of these records, including the one at issue. *See* Tr. at 107–108.

Whether the prosecution acquired the test result from defense counsel or through its own efforts, the test result could have been obtained by either party through diligent discovery. Nothing in the record indicates otherwise. Accordingly, there was no *Brady* violation.

### B. *Ineffective Assistance of Counsel*

Petitioner asserts that had his attorney not made errors prior to and during trial he would not have been convicted. He points to three errors: (1) counsel's failure to object to the prosecution's withholding of evidence; (2) counsel's failure to conduct a factual or legal investigation to determine whether a defense other than insanity could be developed, and (3) counsel's failure to object to the charge to the jury on intoxication.

■ In order to show ineffective assistance of counsel, a petitioner must demonstrate: (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's error, the result in the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687–96, 104 S.Ct. 2052, 2064–69, 80 L.Ed.2d 674 (1984). Petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

#### 1. *Failure to Object to Withholding of Evidence*

Because the Court has determined that the prosecution did not improperly withhold evidence at petitioner's trial, defense counsel's decision not to raise that issue with the trial judge was not an unreasonable one, and petitioner was not prejudiced thereby.

#### 2. *Failure to Investigate Potential Defenses*

Petitioner claims that counsel failed to conduct a factual or legal investigation sufficient to determine whether a defense other than insanity could be developed.

■ The Constitution imposes on counsel a duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. If counsel chooses one particular defense over others, his decision not to investigate those not chosen must be "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgement." *Id.*

■ Although the petition does not specify which defenses petitioner believes his attorney should have "developed," a review of the record indicates that counsel could have pursued an insanity defense or an intoxication

defense. Counsel chose to pursue the former, and not the latter. Presumably, petitioner would argue that, had his attorney conducted a proper investigation, it would have been clear that the latter was the more appropriate defense.

The trial record indicates, however, that there were serious impediments to raising any defense based on petitioner's inability to form the requisite criminal intent. Petitioner's testimony that he voluntarily ingested alcohol on the night of the crime foreclosed the possibility of an involuntary intoxication defense. Petitioner also testified that he did not believe that he was not an alcoholic. Tr. at 183. Circumstances of the crime weakened the viability of a voluntary intoxication defense. Pacing in front of the victim's home to determine the best method and time for attack, unscrewing lightbulbs on the porch and placing a blanket over the victim's head to prevent identification, dampening the victim's fingers to remove her rings are not the marks of a perpetrator who is incapable of forming a criminal intent. In addition, the blood-alcohol test taken on the night of the arrest—the one that petitioner considered so gravely important to his defense—revealed a reading of .1067, a blood-alcohol level only slightly above the legal intoxication level.

On the other hand, there was support for an insanity defense based not only upon petitioner's statements to Dr. Loo during a pretrial psychiatric evaluation—an evaluation from which Dr. Loo diagnosed petitioner as mentally diseased—but also upon petitioner's actions during the crime. Insisting that the police kill him rather than arrest him, and diving through a pane of glass are acts supporting an insanity defense. In addition, counsel's investigation uncovered that petitioner's family had a history of mental disease, that petitioner had problems with severe mood swings, that petitioner had visited mental clinics, and that petitioner had made attempts at suicide. Petitioner's medical records indicated a history of psychiatric problems.

In light of these findings, counsel's strategic decision to pursue an insanity defense, and not to conduct a substantial investigation into an intoxication defense, was informed and reasonable. Counsel did not breach his duty to investigate.

Petitioner relies on *Beavers v. Balkcom,* 636 F.2d 114 (5th Cir.1981). The attorney in *Beavers* was deemed constitutionally ineffective because he pursued an insanity defense without having first obtained his client's medical records and without calling his client's psychiatrist to the witness stand. The defense case included only the testimony of defendant's mother and wife, and the unsworn testimony of the defendant. The instant case is distinguishable because petitioner's counsel subpoenaed all medical records, ordered a psychiatric evaluation, and called the psychiatrist to testify at trial.

### 3. *Failure to Object to the Jury Charge*

█ Petitioner insists that the charge to the jury "did not allow them (sic) to consider the level of intent even though the court found it necessary to charge on intoxication," and argues that his attorney's failure to object to this flaw constituted ineffective assistance of counsel. Petition, at 5.

The trial judge charged the jury as follows:

[I]n any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged.... [A]n intoxicated person is not relieved of criminal responsibility for his conduct merely because he was drunk when he committed a particular crime.... However, this law does provide that evidence of intoxication may be considered by you the jury in determining whether a defendant in fact possessed the requisite intent which is an essential element of the crime charged. In other words, you the jury may consider evidence of defendant's intoxication in determining whether or not the mind of the defendant was so obscured by drink or drugs or a combination that he was incapable of forming the particular criminal intent which the law makes an element of the crime charged.... [T]he prosecution must prove beyond a reasonable doubt that the defendant had the requisite intent to commit a crime in the dwelling and to steal the

property and to knowingly enter the dwelling.

Tr. 130–132.

Although it is difficult to discern the precise nature of petitioner's problem with the charge, the Court determines that the above-quoted portion contains no infirmity so severe as to mandate an objection from counsel. Petitioner's counsel was not unreasonable in choosing not to object to this portion of the charge.

In sum, for the above-reasons, petitioner has failed to establish that his attorney acted unreasonably in his defense. For the same reasons, petitioner has failed to establish that he was prejudiced by the conduct of his counsel. Accordingly, he is not entitled to habeas corpus relief on ineffective-assistance-of-counsel grounds.

## C. *Insufficiency of the Evidence*

■ Petitioner contends that the evidence at trial was insufficient to prove his guilt beyond a reasonable doubt. The Supreme Court has held that the Fourteenth Amendment is violated when a person is convicted without "sufficient proof." *Green v. Abrams,* 984 F.2d 41, 44 (2d Cir.1993) (citing *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979)). The sufficient-proof standard is satisfied where, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis omitted).

■ In determining whether evidence is sufficient to support a criminal conviction, a federal court must look to state law to determine the elements of the crime. *Green,* 984 F.2d at 44 (citing *Jackson,* 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16). Petitioner was convicted of burglary in the first degree, assault in the first degree, and grand larceny in the third degree.

■ Under New York law,

a person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and when, in

effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime: (1) is armed with explosives or deadly weapons; or (2) causes physical injury to any person who is not a participant in the crime; or (3) uses or threatens the immediate use of a dangerous instrument; or (4) displays what appears to be a firearm.

N.Y. Penal Law § 140.30. There is evidence in the record upon which a reasonable juror could find petitioner guilty of burglary in the first degree. The victim testified that she did not give permission to petitioner to enter her home, and in fact locked her door when he attempted to enter. Petitioner forced entry, intending to commit a crime. In the process he caused physical injury to the victim.

■ At the time the crime was committed, New York law provided that "a person is guilty of Grand Larceny in the third degree when he steals property and when the value of the property exceeds $250." N.Y. Penal Law § 155.30. Police testified at trial that they found $340, two rings, a woman's bracelet, and a woman's watch on petitioner's person. The victim testified that these exact items were the ones that the intruder had stolen from her home. It was reasonable, therefore, for the jury to convict on the charge of grand larceny in the third degree.

■ Under New York law, a person is guilty of assault in the first degree where, "[i]n the course and furtherance of the commission or attempted commission of a felony ... he ... causes serious physical injury to a person other than one of [his] participants." N.Y. Penal Law § 120.10. The victim was admitted to the hospital on the night of the crime, where she was treated for severe lacerations above her left eye and on her right pinky finger, and for other injuries to her lower back and legs. The victim testified that she has a permanent loss of movement in her injured finger and continues to suffer pain in her head and back. A reasonable juror could have found that her injuries were serious. The trial record clearly supports a finding that defendant was guilty of assault in the first degree.

■ For all three crimes charged, the prosecution had to prove beyond a reasonable doubt that petitioner possessed a culpable mental state. *See People v. Segal*, 54 N.Y.2d 58, 444 N.Y.S.2d 588, 591–92, 429 N.E.2d 107, 109–11 (1981). Both the prosecution and the defense presented expert testimony on the issue of petitioner's mental state at the time of the crime. Dr. Loo, testifying for the defense, diagnosed petitioner as a manic depressive with acute brain syndrome, noting that the use of alcohol and drugs could cause petitioner to lose his ability to appreciate whether his conduct was wrong. In contrast, Dr. Zolan testified that petitioner knew what he was doing during the commission of the crime and knew it was wrong. He based his conclusion on defendant's conduct and statements which indicated awareness and goal orientation. A reasonable juror could have found Dr. Zolan's testimony more persuasive than Dr. Loo's, and determined that petitioner possessed a culpable mental state. For the same reasons, it was not unreasonable for the jury to reject petitioner's insanity defense.

In sum, a rational trier of fact could reasonably conclude that petitioner was sane at the time the crimes were committed and that the essential elements of the crimes were proven beyond a reasonable doubt. As such, petitioner's claim that the verdict was against the weight of the evidence is without merit and habeas relief is denied on that ground.

D. *Excessive Sentence not Authorized by Statute*

■ Petitioner asserts that the charges in the indictment stem from the same act and that, therefore, the sentence for grand larceny should not have been imposed to run consecutively to the sentence for burglary. "The Eighth Amendment is not a general grant to the federal courts of power to review sentences. Rather, it allows the review of the punishment specified by statute." *Fielding v. LeFevre*, 548 F.2d 1102, 1108 n. 12 (2nd. Cir.1977). "A sentence imposed by a state court that is within the range authorized by the state legislature is not grounds for relief in federal habeas corpus review."

*Alexander v. Jones*, No. 88 CV 229, 1988 WL 70622 (E.D.N.Y. May 26, 1988).

Typically, concurrent terms of incarceration are appropriate in New York "when more than one sentence of imprisonment is imposed on a person for two or more offenses committed ... through an act ... which itself constituted one of the offenses and also was a material element of the other," *see* N.Y. Penal Law § 70.25(2). However, "if separate and distinct acts [are] committed and ... they violate[ ] more than one section of the Penal Law, punishment for each of them [is] proper although they arose out of a single transaction." *People ex rel. Maurer*, 2 N.Y.2d 259, 159 N.Y.S.2d 203, 206–07, 140 N.E.2d 282, 284–86 (1957); *see also People v. Jackson*, 6 A.D.2d 919, 175 N.Y.S.2d 945, 945–46 (3d Dep't 1958) (holding that where defendant unlawfully entered a house and stole a television set, defendant committed two offenses, each of which was subject to separate punishment, and that imposition of consecutive sentences was proper).

■ In the instant case, the assault was a material element of the burglary and the sentences for those crime were properly imposed to run concurrently. On the other hand, the taking of the victim's property was not an element of burglary; burglary requires only the intent to commit a crime inside the dwelling. *See People v. Jackson*, 175 N.Y.S.2d at 945–46. Petitioner possessed that intent, but in addition he proceeded to commit the separate and distinct act of grand larceny. Therefore, consecutive sentences for burglary and grand larceny were appropriate.

Accordingly, petitioner's consecutive sentence is within the permissible range allowed by law and "does not present a constitutional question necessary for habeas corpus review." *Underwood v. Kelly*, 692 F.Supp. 146, 152 (E.D.N.Y.1988), *aff'd*, 875 F.2d 857 (2d Cir.1988), *cert. denied*, 493 U.S. 837, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989).

Habeas relief is therefore denied on this ground.

### III. *CONCLUSION*

For the above reasons, the petition for a writ of habeas corpus is denied. In addition, the Court determines that the petition presents no question of substance for appellate review, and that petitioner has failed to make a "substantial showing" of denial of a federal right. *See Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983); *Rodriquez v. Scully,* 905 F.2d 24 (2d Cir.1990). Accordingly, a certificate of appealability will not issue.

SO ORDERED.